**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

AMELIO D. MACK,

    Petitioner,

v.                                         Case No. 3:15-cv-1196-J-32MCR

UNITED STATES OF AMERICA,

    Respondent.

---

# **O R D E R**

This case is before the Court on Petitioner Amelio Mack's Motion to Vacate, Set Aside, or Correct Sentence. (Doc. 1). The government responded in opposition to the motion, (Doc. 9), to which Mack replied, (Doc. 12). Pursuant to Rule 8(a) of the Rules Governing Section 2255 Proceedings, the Court has determined that an evidentiary hearing is not necessary to decide the petition. See Aron v. United States, 291 F.3d 708, 714–15 (11th Cir. 2002) (an evidentiary hearing on a § 2255 petition is not required when the petitioner asserts allegations that are affirmatively contradicted by the record or patently frivolous, or if in assuming that the facts he alleges are true, he still would not be entitled to any relief).

## I. BACKGROUND

On November 13, 2013, Mack was indicted for conspiracy to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A), (Count I), and distribution of five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A), (Count II). (Cr. Doc. 1).[1] On May 12, 2014, Mack pled guilty to Count I of the indictment pursuant to a plea agreement with the government, and the court accepted his plea on May 14, 2014. (Cr. Docs. 32, 34). The factual basis supporting the guilty plea states in part:

> In or about 2005, Amelio Mack began distributing multi-ounce quantities of cocaine to an individual in Jacksonville that was re-distributing the cocaine to others, one of whom was Cedric Sapp. Sapp learned that Mack was the source of supply for the cocaine and, in or about 2006, Mack gave his phone number to Sapp and they began dealing in cocaine directly with one another. . . . Mack and Sapp developed a close relationship, and Sapp was able to sell as much cocaine as Mack could provide. Over the years, the amount of cocaine that Mack supplied to Sapp increased.
> In or about February 2010, Sapp and others got a warehouse on Lem Turner in Jacksonville, purchased some dump trucks, and started a business in an effort to appear to have some form of legitimate income. . . .
> In or about September, 2011, Sapp and others moved from the Lem Turner warehouse to a warehouse on Dunn Avenue in Jacksonville. Sapp continued to get kilograms of cocaine from Mack on a regular basis, all of which were packaged in distinctive silver tape. . . . Mack would meet Sapp at the Dunn Avenue

---

[1] Citations to Mack's underlying criminal case, United States v. Mack, no. 3:13-cr-206-J-32-MCR, are designated "Cr. Doc.", whereas citations to the record of this case are designated "Doc."

2

>   warehouse to deliver the cocaine, and receive payment for the cocaine. This continued until the last shipment on April 18, 2013.
>
>   . . . [O]n April 18, 2013, on [a] pole camera, which was recording all data, officers saw an individual, later identified as Amelio Mack, drive to the Dunn Avenue warehouse and take a duffle bag from the trunk of his car into the warehouse. Shortly thereafter, Mack left the warehouse. Later that day, the officers got a state search warrant for the warehouse and upon executing it, found 8 kilograms of cocaine, approximately $106,000, and 10 empty kilogram wrappers from a prior shipment of cocaine.
>
>   On February 5, 2014, Mack was arrested in his residence in Jacksonville. Law enforcement officers obtained a search warrant for the residence and located, among other things, $281,850.32 in U.S. currency, various jewelry, and the distinctive silver tape that was used to wrap the kilograms of cocaine.

(Doc. 9-1 at 20–22). During the plea process and at sentencing, Mack was represented by attorney Clyde Collins.

The Presentence Investigation Report ("PSR") states that during the search of Mack's residence, deputies found a Glock 23 pistol with a high capacity magazine and a fully loaded 12-guage shotgun. (Cr. Doc. 42 ¶ 22). Additionally, the PSR states "[b]ecause a firearm was present at the defendant's residence along with drug proceeds and items used in conjunction with his drug trafficking activities, a two-level increase [under U.S.S.G. § 2D1.1(b)(1)] is warranted." (Cr. Doc. 42 ¶ 29). The PSR scored a total offense level of 37, which included a base offense level of 38, the 2 level firearm enhancement, and a 3 level reduction for acceptance of responsibility. (Cr. Doc. 42 ¶¶ 28–37). Mack's criminal history score was seven, giving him a criminal history category of IV. (Cr. Doc. 42 ¶¶ 58–59). According to the PSR, the

minimum term of imprisonment was 10 years, the maximum term was life, and the guideline imprisonment range was 292 to 365 months. (Cr. Doc. 42 ¶¶ 89–90).

At sentencing, the court reviewed these calculations with Mack and the government. (Doc. 9-3 at 6–8). Neither party objected to the factual statements contained in the PSR. (Doc. 9-3 at 6). Collins did object to the PSR's guideline calculation. (Doc. 9-3 at 7). According to the plea agreement, Mack was supposed to get a two level reduction in the base offense level pursuant to the United States Sentencing Commission's proposed amendment to the drug guidelines. (Doc. 9-3 at 7). Collins then argued for other downward variances, including: for cooperation with law enforcement; that his criminal history score over represents the seriousness of his past criminal conduct; that his coconspirator only received a four year sentence in state court; that Mack has a caring family whom he had always supported; that he has physical ailments and illnesses the court should consider; and that statistical analysis supports a sentence closer to ten years than to twenty years. (Doc. 9-3 8–42). However, during the hearing, neither Mack nor Collins objected to the PSR's recommended firearm enhancement. (Doc. 9-3).

The Court agreed to accept a two-level downward variance based on the proposed amendments to the Sentencing Guidelines, but did not otherwise vary the guideline range. (Doc. 9-3 at 43). This gave Mack a guideline range of

4

235 to 293 months of imprisonment, and the court sentenced Mack to a term of imprisonment of 235 months. (Doc. 9-3 at 44). Mack, represented by new counsel, filed an appeal, but then voluntarily dismissed it pursuant to the appeal waiver in his plea agreement. (Cr. Docs. 65, 70, 74).

Mack now collaterally attacks his sentence pursuant to 28 U.S.C. § 2255. (Doc. 1 at 7). Mack's petition asserts only one ground: that Collins's failure to object to the two-level firearm enhancement under U.S.S.G. § 2D1.1(b)(1) constituted ineffective assistance of counsel. (Doc. 1 at 7–8).

## II. STANDARD OF REVIEW

Under § 2255, a person in federal custody may move to vacate, set aside, or correct his sentence on four specific grounds: (1) the imposed sentence was in violation of the Constitution or laws of the United States; (2) the court did not have jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a) (2012). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamental as to cause a complete miscarriage of justice will warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184-86 (1979). A petitioner's challenge to his sentence based on a Sixth Amendment claim of ineffective assistance of counsel is normally considered in a collateral attack. United States v. Teague, 953 F.2d 1525, 1534 n.11 (11th Cir. 1992).

5

To succeed on a claim of ineffective assistance of counsel, a petitioner must show both (1) that counsel's performance was deficient, and (2) that as a result of counsel's deficient performance, the petitioner suffered prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). In determining whether counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance. Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994). The petitioner must show, in light of all the circumstances, that counsel's performance fell outside the "wide range of professionally competent assistance." Id. A lawyer's performance is presumed to be reasonable; and the petitioner must prove that "no counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 n.15 (11th Cir. 2000) (en banc).

To show that counsel's deficient performance prejudiced the defendant, the petitioner must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Id. at 1036-37 (citing Strickland, 466 U.S. at 694). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694. In determining whether a petitioner has met the two prongs of deficient performance and prejudice, the Court considers the totality of the evidence. Id. at 695. However, because both prongs are necessary, "there is no reason for a court . . . to approach the inquiry in the same order or even to

6

address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Wellington v. Moore, 314 F.3d 1256, 1261 n.1 (11th Cir. 2002) ("We need not discuss the performance deficiency component of [petitioner's] ineffective assistance claim because failure to satisfy the prejudice component is dispositive.").

## III. ANALYSIS

Mack argues that his counsel's performance was ineffective because "he failed to recognize or argue that the two-level enhancement in USSG § 2D1.1(b)(1) was inapplicable to Mack's case." (Doc. 1 at 8). Essentially, Mack's argument for Strickland's two part test is this: (1) Collins's performance was deficient because he failed to recognize that the enhancement clearly does not apply; and (2) Collins's deficient performance prejudiced Mack because the enhancement does not apply. (Doc. 1). Thus, the majority of Mack's argument is only that the two-level enhancement does not apply to him. His contention that counsel was ineffective is based on the premise that not objecting to the firearm enhancement was a "glaring omission" and not a strategic decision. (Doc. 1 at 14).

In a drug trafficking crime, the sentencing guidelines direct a two level increase "[i]f a dangerous weapon (including a firearm) was possessed . . . ." U.S.S.G. § 2D1.1(b)(1). This increase applies "if the weapon was present, unless it is clearly improbable that the weapon was connected with the

7

offense." Id. § 2D1.1 cmt. n.11(A). The government must show by a preponderance of the evidence "that a firearm was 'present' at the site of the charged conduct or that the defendant possessed it during conduct associated with the offense of conviction." United States v. George, 872 F.3d 1197, 1204 (11th Cir. 2017). If the government meets this initial burden, the defendant must then establish that it was "clearly improbable" that the weapon was connected with the offense. Id.

The Eleventh Circuit has previously held (albeit in an unpublished decision) that the government meets its burden by showing "that a gun was recovered in the same room as scales, a bag containing cocaine residue, and a large amount of cash." United States v. Grimes, 705 F. App'x 897, 900–01 (11th Cir. 2017). Furthermore, where the offense is conspiracy, the firearm enhancement applies "if the firearms are found in a place where acts in furtherance of the conspirac[y] took place." United States v. Pham, 463 F.3d 1239, 1246 (11th Cir. 2006). However, mere possession, without some connection to the offense, is insufficient. United States v. Stallings, 463 F.3d 1218, 1220–21 (11th Cir. 2006).

A firearm that could be used to protect drug proceeds has the potential to facilitate a conspiracy to traffic drugs. United States v. Jones, 657 F. App'x 938, 948 (11th Cir. 2016) (citing United States v. Carillo-Ayala, 713 F.3d 82, 91–92 (11th Cir. 2013)). In Jones, the defendant was convicted of conspiracy to

8

distribute cocaine and possession with intent to distribute cocaine. Id. at 941. During the defendant's arrest, law enforcement officials searched two residences that belonged to the defendant. Id. The first residence contained security system monitors, a loaded firearm, an extra magazine, a money counter, a number of plastic baggies, a collection of watches, a collection of sneakers, and a BMW containing more than $250,000 in cash in the trunk. Id. Although the first residence did not contain evidence explicitly related to cocaine trafficking, the court stated that the firearm "had the potential to facilitate the charged crime, since it could be used to protect [the defendant's] drug proceeds." Id.; see also United States v. Quintanilla, 658 F. App'x 496, 501 (11th Cir. 2016) (stating that the defendant's possession of a firearm to protect transportation of drug proceeds was notable and had the potential to facilitate the offense). Further, the court distinguished the case from Stallings, which denied the enhancement based on mere possession at the residence without any evidence connecting it to the drug trafficking activity. Id. at 947.

Here, Mack has not satisfied his burden of demonstrating that no reasonable counsel would have taken the action that his counsel did take. See Chandler, 218 F.3d at 1315. The transcript of the sentencing hearing demonstrates that Collins argued that Mack had accepted responsibility for his actions, that he had assisted the government, that his co-conspirator received a much shorter sentence, and that he had a supportive family who

cared about him. (Doc. 9-3). It is reasonable that Collins did not want to discuss the firearms found in Mack's apartment alongside lavish jewelry, cars, large sums of cash, surveillance equipment, and drug packaging materials. (See Doc. 9-1 at 20–22). Furthermore, Collins likely did not want to bring up that Mack had been evading arrest for several months and was caught attempting to flee his residence on the date of his arrest. (Cr. Doc. 42 ¶ 21).

Contrary to Mack's assertions, the connection between the firearms and the proceeds of Mack's illegal drug conspiracy is not "tenuous." (Doc. 1 at 6; Doc. 9-3). Similar to Jones, Mack likely used the firearms to protect the proceeds of his illegal drug conspiracy. See 657 F. App'x at 948. Protecting drug proceeds with a firearm has the potential to facilitate the charged crime, which would make the enhancement applicable. See id. Thus, it was not "obvious" that the enhancement did not apply, and Collins's decision not to object was reasonable. See Chandler, 218 F.3d at 1315.

Although the indictment states that the conspiracy ended "in or about April, 2013," other undisputed factual descriptions of Mack's conduct indicate that Mack and Sapp were not the only two persons involved in the conspiracy. (See Cr. Doc. 32 at 20). Mack admitted to the facts contained in the factual basis, (Cr. Doc. 107 at 22), the very first sentence of which states that Mack was distributing cocaine to someone other than Sapp. (Cr. Doc. 32 at 20). Additionally, the factual basis refers to several persons, in addition to Sapp,

who owned the warehouses where Mack delivered cocaine. (Cr. Doc. 32 at 20–22). Therefore, it is clear that the conspiracy was among more than just Mack and Sapp, and, thus, could have continued beyond Sapp's arrest.[2] After Sapp's arrest, Mack became a fugitive. (Cr. Doc. 42 ¶ 21). At the time of his arrest at his home, where more than $281,000 in cash and his signature silver tape were found, Mack attempted to flee the arresting officers. (Cr. Doc. 42 ¶ 21).

While Collins arguably should have objected to the firearm enhancement, it is not obvious that the enhancement does not apply, such that Collins's failure to object would fall outside the "wide range of professionally competent assistance." Weeks, 26 F.3d at 1036. Because Mack has failed to prove deficient performance, the Court need not address prejudice. See Strickland, 466 U.S. at 695.

## IV. CONCLUSION

Accordingly it is hereby

---

[2] Although the Indictment states that the conspiracy ended "in or about April, 2013," a district court is authorized to take into account information that is not within the indictment when determining sentencing enhancements. See United States v. Louis, 559 F.3d 1220, 1224 (11th Cir. 2009) ("[T]he district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the [presentence investigation report], or evidence presented during the sentencing hearing."); cf. United States v. Harper, 339 F. App'x 974, 978 (11th Cir. 2009) (holding that the district court did not clearly err in finding two checks, not included within the indictment, as relevant evidence to be used in determining the loss amount for a sentencing enhancement).

11

**ORDERED:**

Petitioner's Motion to Vacate, Set Aside, or Correct Sentence (Doc. 1) is **DENIED**.

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-Eli v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Petitioner has not made the requisite showing in these circumstances. Because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis. Thus, the certificate of appealability and leave to appeal in forma pauperis are **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida this 18th day of April, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

jb
Copies to:

Counsel of record